UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No.: | 3:11-CR-61 |
| | ) | | (VARLAN/SHIRLEY) |
| RALPH VANOVER, | ) | | |
| | ) | | |
| Defendant. | ) | | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

The defendant, Ralph Vanover, was charged in a six-count superseding indictment with two counts of aiding and abetting the distribution of oxycodone, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 18 U.S.C. § 2, two counts of distributing oxycodone and alprazolam, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 841(b)(2), possession with the intent to distribute oxycodone in violation of 21 U.S.C. §§ 841(a)(1) and 841(b(1)(C), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) [Doc 16]. In June 2012, the defendant proceeded to a jury trial before the undersigned [*See* Docs. 40—42].[1] The jury returned a verdict on June 27, 2012, finding the defendant guilty of aiding and abetting the distribution of oxycodone, two counts of possession with intent to distribute

---

[1] Prior to trial, one of the counts of the superseding indictment charging the defendant aiding and abetting the distribution of oxycodone was dismissed upon motion of the government [Docs. 38, 39].

oxycodone and alprazolam, and possession with the intent to distribute oxycodone [Doc. 43]. The jury returned a not guilty verdict with respect to the firearm charge [*Id.*].

A Presentence Investigation Report ("PSR") was prepared pursuant to Rule 32 and the United States Sentencing Commission Guidelines Manual (the "Guidelines" or "U.S.S.G."). Pursuant to U.S.S.G. § 2D1.1, the PSR holds the defendant responsible for the equivalent of 91.44 kilograms of marijuana, resulting in a base offense level of 24 under U.S.S.G. § 2D1.1(c)(8). The PSR then applies U.S.S.G. § 2D1.1(b)(1), which adds two levels for the possession of a dangerous weapon. The PSR also applies U.S.S.G. § 2D1.1(b)(12), which adds two levels for the maintenance of a premises for the purpose of manufacturing or distributing a controlled substance, resulting in a total offense level of 28. The PSR assigns the defendant a criminal history category of I, and this in conjunction with the total offense level of 28 results in a Guidelines range of 78 to 97 months.

The defendant filed two objections to the PSR, on which the Court heard argument during the first phase of the defendant's sentencing hearing.[2] The Court took the objections under advisement. This memorandum opinion and order addresses those objections.

---

[2] The Court also heard argument about defendant's request for a downward departure and/or variance [Doc. 66]. However, at the second phase of sentencing, held on April 16, 2013, the Court denied the defendant's request and sentenced the defendant to a guidelines sentence of 80 months' imprisonment based upon the consideration of the factors set forth in 18 U.S.C. § 3553(a).

I.  **Defendant's Objections to the PSR**

   A.  **Possession of a Firearm**

The defendant objects to the two-level enhancement for possession of a firearm pursuant to U.S.S.G. § 2D1.1(b)(1) as set forth in Paragraph 30 of the PSR. The defendant argues that he was acquitted on Count VI of the superseding indictment, which charged him with knowingly possessing a firearm in furtherance of a drug-trafficking crime. The defendant also states there was no evidence establishing that he was armed at the time any drug sales occurred. The defendant submits that of the firearms recovered during the execution of the March 7, 2011 search warrant, none were loaded, several were located in a safe, and there was no evidence that they were present during any drug transactions. Citing to *United States v. Caballero*, 417 F. App'x 500 (6th Cir. 2011), the defendant argues the enhancement must not be applied because the government has not shown a connection between the firearms and drug offenses.

The government submits that the enhancement was properly applied. In support, the government notes that it bears the burden of proving that the defendant actually or constructively possessed the weapon and that such possession was during the commission of the offense, arguing it has met its burden, as agents recovered multiple firearms from defendant's home, where the drug transactions alleged in the indictment took place. The government also notes law enforcement recovered a handgun near where defendant was arrested and argues the number and type of weapons involved, the accessibility of the

firearms, the presence of ammunition, and the proximity of the drugs to the firearms weigh in favor of applying the enhancement.

Section 2D1.1(b)(1) provides that if a firearm was possessed, the offense level should be increased by two levels. The government bears the initial burden of proving by a preponderance of the evidence that "'(1) the defendant actually or constructively "possessed" the weapon, and (2) such possession was during the commission of the offense.'" *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007) (quoting *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996)). "If the government proves both elements, 'the weapon is presumed to have been connected to the defendant's offense.'" *Caballero*, 417 F. App'x at 506 (citation omitted). The burden then shifts to the defendant to show that it was "clearly improbable" that the firearm was connected to the offense. *Id*. If the defendant fails to meet his burden, then "the district court should apply the enhancement." *Id*. at 506–07. The Sixth Circuit has held that "[p]ossession during the commission of the offense may be found if the firearm could have facilitated the illegal drug transactions." *United States v. Tisdale*, 952 F.2d 934, 937 (6th Cir. 1992) (alterations, citations, and internal quotation marks omitted). More recently, in *Caballero*, the Sixth Circuit noted that "the Guidelines do not require that the firearms be readily accessible to be connected with the drug offense." 417 F. App'x at 507.

In determining whether the enhancement applies, a court is to consider the following: (1) the type of firearm involved; (2) the accessibility of the weapon to the defendant; (3) the presence of ammunition; (4) the proximity of the weapon to the illicit

4

drugs; (5) the defendant's evidence concerning the use of the weapon; and (6) whether the defendant was actually engaged in drug-trafficking rather than mere manufacturing or possession. *United States v. Greeno*, 679 F.3d 510, 515 (6th Cir. 2012). The facts of *Greeno* are analogous to the instant case. There, the court upheld the application of the enhancement when guns were found at the home where defendant distributed methamphetamine. *Id.* at 513. Law enforcement officials recovered rifles and handguns found throughout the home, which the court noted gave the defendant accessibility to them. Law enforcement also recovered ammunition for the firearms, and both weapons and ammunition were located in close proximity to illicit drugs. *Id.* In light of these facts the court concluded that the defendant was unable to prove a connection to be "clearly improbable." *Id.* at 516.

In this case, the government has presented sufficient evidence to raise the rebuttable presumption that defendant's firearms were connected to the offense. The government presented evidence at trial and at the sentencing hearing that the defendant possessed several firearms: one located in the closet of his bedroom; another located in a closet in an adjacent bedroom; multiple firearms located in a safe downstairs; and a gun found near the defendant at the time law enforcement apprehended him [*See* PSR ¶ 15]. Given the undisputed evidence of the defendant's possession of the firearms at the time the search warrant was executed, the government has met its burden of showing the defendant possessed these firearms during the commission of the offense so as to raise the presumption that the guns and drugs were connected. As to defendant's argument

that his acquittal on Count VI of the indictment should bar application of the enhancement, the defendant cites to no case law for this point and overlooks the fact that the statute criminalizes possession "in furtherance of" which is not the same level of possession required by the Guidelines.[3]

While defendant argues that the seized firearms were for hunting or general protection purposes, the evidence presented in support of this argument does not meet the defendant's burden of showing it is clearly improbable that the seized firearms were connected to the drug offenses, particularly in light of the other factors utilized by the Sixth Circuit. The defendant noted that there was evidence of target practice when law enforcement executed the search warrant, and at the sentencing hearing the defendant's son testified to using the weapons for hunting and target practice. This evidence, however, goes toward one of several factors the Court is to consider, and consideration of those other factors weighs heavily in favor of applying the enhancement.

As to the first factor set out by *Greeno*, law enforcement in this case not only recovered several rifles, which the defendant argues were used for hunting, but also recovered several handguns, including one that was in close proximity to the defendant at the time of his arrest. Regarding accessibility, like the defendant in *Greeno* the defendant stored firearms in several places, so that "regardless of where [the defendant] was on the property, he had ready access to the firearms." 679 F.3d at 515. Ammunition for the

---

[3] This argument also assumes that the jury's failure to find beyond a reasonable doubt a violation of 18 U.S.C. § 924(c) means the government cannot meet the lower burden of preponderance of the evidence necessary to apply the enhancement.

firearms was located both inside of the house and elsewhere on the property. Although not all of the firearms were located near illicit drugs, weapons and ammunition as well as prescription pills were seized from the defendant's bedroom, where the defendant conducted drug sales. Finally, the defendant was found guilty of two counts of distribution and one count of possession with the intent to distribute, indicating that the defendant was involved in drug distribution and trafficking rather than mere possession of the 1000 pills officers recovered. Accordingly, the enhancement under § 2D1.1(b)(1) applies and the defendant's objection is **OVERRULED**.

      **B.**      **Maintaining a Premises for Drug Distribution**

The defendant also objects to the two-level enhancement for maintaining a premises for the purpose of manufacturing or distributing a controlled substance pursuant to U.S.S.G § 2D1.1(b)(12) as set forth in Paragraph 31 of the PSR. The defendant argues that the house was not maintained for the purpose of selling drugs. The defendant submits that only four controlled purchases were made in this case prior to the execution of the search warrant, all taking place within approximately two weeks. The defendant argues that using the house for the sale of drugs was incidental or collateral to maintaining the home as a residence.

The government responds that the enhancement is appropriate in this case, arguing that trial evidence showed people were constantly purchasing pills at defendant's home and that there was normally a line at the residence to purchase prescriptions from him. The government also points out the large volume of pills in the home, the drug ledger that

was found in the bedroom, and the safe in the yard that held drugs and concludes that the house was maintained for the sale of prescription drugs.

Section 2D1.1(b)(12), often referred to as the "crack house" enhancement, was implemented after the Fair Sentencing Act of 2010, in which Congress directed the Sentencing Commission to add an enhancement for when a "defendant maintained an establishment for the manufacture or distribution of a controlled substance, as generally described in section 416 of the Controlled Substances Act (21 U.S.C. § 856)." *United States v. Miller*, 698 F.3d 699, 705 (6th Cir. 2012) (quoting Pub. L. No. 111-220, §6(2), 124 Stat. 2372, 2373 (2010)).

Application Note 17 states that the enhancement applies "to a defendant who knowingly maintains a premises (i.e. a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution." Note 17 further provides:

> [m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.[4]

There are no opinions from any courts within the Sixth Circuit directly addressing the issue of whether the drug activity is an incidental/collateral or primary/principal use

---

[4] The application note also sets forth factors to consider in determining whether a defendant "maintains" premises, but the defendant does not dispute that aspect of the enhancement, given his ownership of the premises in question.

when the home is also used as a residence.[5] Examining cases from courts outside of the Sixth Circuit who have addressed the issue leads the Court to conclude the enhancement should apply in this case.

In *United States v. Ortiz*, 807 F. Supp. 2d 746 (N.D. Ill. 2011), the government objected to the omission of the enhancement where a defendant had been involved in arranging a drug shipment to arrive at an unoccupied house to which the defendant had access. *Id.* at 748. The defendant, who pleaded guilty to a drug offense, admitted as part of his plea agreement that he was using the residence solely for the purpose of his drug distribution activities. *Id.* The instant offense was the first time the defendant had used the property for distributing a controlled substance. *Id.* The court found that this activity was insufficient to impose the enhancement. *Id.* at 749. In coming to this conclusion, the court applied the Seventh Circuit's jurisprudence under 21 U.S.C. § 856,[6] interpreting "maintaining a drug house" as using those premises for selling or storing drugs "for a sustained period of time . . . ." *Id.* (citing *United States v. Acosta*, 534 F.3d 574, 591 (7th Cir. 2008)) (emphasis omitted). The court found that the defendant's one-time use of the

---

[5] The Court notes that while the court in *Cole v. United States*, No. 1:11-CV-1309, 2012 WL 4470117 (W.D. Mich. Sept. 27, 2012), referenced U.S.S.G. § 2D1.1(b)(12), it did so in the context of a claim of ineffective assistance of counsel and did not address whether the enhancement was properly applied.

[6] That statute makes it unlawful to knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance. 21 U.S.C. § 856(a)(1).

9

residence to receive a drug shipment did not qualify as using the premises for a sustained period of time, even if he had intended to use it in this manner in the future.[7]

The Eighth Circuit upheld application of the enhancement to the defendants in *United States v. Miller*, 698 F.3d 699 (8th Cir. 2012). In that case, a husband and wife were both found guilty of aiding and abetting the distribution of methamphetamine. The husband was found guilty on four counts of distribution based on four controlled buys made by an informant. During his interview with law enforcement, however, the husband had admitted he was involved in drug distribution activities from 2004—2010. The wife was found guilty on three counts of distribution, based on three controlled buys made to an informant. In her interview, the wife admitted to having assisted in the distribution of methamphetamine "on several occasions." *Id.* at 702. At sentencing, the district court applied the enhancement to both defendants and both appealed.

The husband argued that the four controlled purchases in 2010 were insufficient to show he maintained the family home for drug distribution. However, the court disagreed, finding that the husband's admission to distributing meth for several years, the fact that his customers could find meth in "unusual locations such as beside a fence post," and the

---

[7] Similarly, the Eastern District of Texas found insufficient evidence to impose the enhancement in *United States v. Morales-Ortuno*, 879 F. Supp. 2d 608 (E.D. Tex. 2012). In that case, the defendant had been observed making controlled purchases elsewhere when he signed for a new apartment. *Id.* at 609. Within a week of the defendant's signing for the new apartment, two more controlled purchases were made by a co-defendant at another location, and officers subsequently located drugs inside the apartment after a search warrant was issued. *Id.* at 610. The court found that, given the short time period the defendant had controlled the apartment and the fact that there was no actual drug-selling activity observed at the apartment, it was inappropriate to apply the enhancement. *Id.*

fact that the husband kept drug ledgers all indicated that the premises was maintained for drug distribution, warranting the enhancement. *Id.* at 706.

The court also held that the enhancement was appropriately applied to the wife. The wife argued that she did not maintain the defendants' home for the purpose of distributing controlled substances but rather as a "family home." *Id.* The court concluded that, given the evidence that the wife was involved in at least three controlled purchases on the property and had admitted to accepting payments on other occasions, the "drug distribution activities were more than an 'incidental or collateral' use of the premises by [the wife]." *Id.* at 706—07. The court noted that Congress "surely intended to deter the manufacture and distribution of illegal drugs in 'crack houses' where children are being raised." *Id.* at 707 (noting the similarity between U.S.S.G. § 2D1.1(b)(12) and 21 U.S.C. § 856). The court held that the enhancement applies "when a defendant uses the premises for the purpose of substantial drug-trafficking activities, even if the premises were also her family home at the times in question." 698 F.3d at 707.

The Seventh Circuit used a similar approach in analyzing and upholding the application of the enhancement to the defendant in *United States v. Sanchez*, 710 F.3d 724, 2013 WL 819377 (7th Cir. Mar. 6, 2013). There, the court examined the enhancement's application to a defendant who pleaded guilty to conspiracy to distribute more than five kilograms of cocaine. 2013 WL 819377 at *1. The defendant used his home to hold meetings with drug dealers, would receive drugs at his garage, and also stored drugs in the attic of the home. The defendant kept drugs at the home only for as

11

long as necessary, however, and would often quickly transfer them off the premises. This conduct took place over a two-year period. The defendant argued that he primarily used the home as a residence for his family.

The Seventh Circuit disagreed with the defendant, noting:

> The enhancement clearly contemplates that premises can have more than one principal use. We can thus dispose of the argument that, because [the defendant] primarily used the home for raising a family, he could not have also primarily used it for selling drugs. Rather, the proper inquiry is whether the drug transactions were a second primary use of the premises or were instead merely a collateral use.

*Id.* at \*5. From this, the court proceeded to analyze the enhancement in the context of 21 U.S.C. § 856 and the case law interpreting whether distributing drugs represented a "primary or principal" use of the premises. *Id.* at \*6 (citing *United States v. Verners*, 53 F.3d 291, 296—97 (10th Cir. 1995)) (noting that use could be primary or principal when illegal activity had "characteristics of a business," including "packaging materials[,]" "financial records[,] profits[,] . . . and the presence of multiple employees or customers"). The court noted that the *Miller* court considered the frequency the premises were used for the prohibited purposes and whether sales from such use were "substantial." *Id.* (citing *Miller*, 689 F.3d at 706—07). Applying that reasoning, the court found that the defendant's use of the home to conduct all of his drug transactions over a two-year period, and given the broad scope of the conspiracy, warranted the application of the enhancement. *Id.* at \*8. The court noted, however, that neither a specific frequency of

prohibited use nor a particular significant amount of activity would warrant the enhancement; the two were considered "in tandem." *Id.* at *7.[8]

Turning to this case, the defendant argues that he maintained the property for fifteen years as a residence, including building and then living in his home with his children, and that the drug activity in this case was incidental relative to the time the property served as a residence. As both the Seventh Circuit and Eighth Circuit held, however, premises may have more than one principal use. The focus of the analysis should not be a comparison between how often the home was used as a residence and how often for drug storage and distribution. If so, then the enhancement would rarely apply when a defendant lived and sold drugs in the same place. Rather, the proper analysis focuses on whether the drug storage and distribution on the property were such that it was a primary or principal use of the property.

From this background, the Court concludes that the PSR appropriately applied the enhancement. While the drug activity in this case may not have carried on for as long as

---

[8] The Court notes that while it is aware of other cases addressing the application of § 2D1.1(b)(12), those cases are inapposite to the issues presented in this case. Several of those cases address the question of whether the defendant had a significant possessory or ownership interest such that he "maintained" a premises, which is not at issue here as the defendant owned the property in question. *See United States v. Chagoya*, No. 12-40452, 2013 WL 425809 (5th Cir. Jan. 31, 2013) (finding enhancement appropriate where defendant resided at premises and shared responsibility for expenses); *United States v. Fuentes-Ontiveros*, — F. Supp. 2d. —, 2012 WL 6968991 (D. New Mexico May 18, 2012) (finding enhancement appropriate where defendant lived at the residence and participated in drug activities). Other cases involved defendants who did not reside at the premises in question and solely used them for drug purposes, which is not the case here as the defendant resided at the home with his family. *See United States v. Bueno*, 703 F.3d 1053 (7th Cir. 2013) (finding enhancement appropriate where defendant maintained premises solely as stash house); *United States v. Sandoval-Chavez*, 477 F. App'x 154 (5th Cir. 2012) (same).

the drug conspiracy in *Sanchez*, the facts of this case are similar to the *Miller* defendants.[9] Like the defendants in *Miller*, the defendant was convicted only for the number of controlled purchases made at his property, but those purchases were not the entirety of the defendant's drug activity.[10] The wife in *Miller* was a part of three controlled sales which took place in a two-month period, yet the Eighth Circuit still found the enhancement appropriate in light of the drug activity that took place at the residence. That same reasoning applies here.

As in *Miller*, there was significant evidence in this case of a more long-term and substantial drug activity than the three controlled purchases for which the defendant was convicted. Law enforcement recovered the following during the search warrant: multiple pill bottles containing close to 1000 assorted pills, multiple bags of marijuana, firearms and ammunition, drug ledgers, drug scales and other paraphernalia, security cameras, and $8,600 in cash [PSR ¶ 16]. The drug ledgers, scales, cash, and security cameras are particularly characteristic of a drug "business" that is more than a "collateral or incidental" use of the property. *Cf. Miller*, 698 F.3d at 706 (noting that defendant kept drug ledgers with the names and locations of suppliers and customers). Similar to *Miller*,

---

[9] This case is dissimilar from the defendants in *Ortiz* and *Morales-Ortuno* because, unlike those defendants, the defendant here engaged in multiple controlled purchases of drugs from his residence.

[10] Although the defendant was directly involved in three of the controlled purchases [PSR ¶ 31], the fourth controlled purchase is still relevant to this Court's determination of whether the enhancement should apply, and in fact bolsters the Court's conclusion that the enhancement should apply in this case, given that the defendant allowed others to use his property to sell prescription pain medicine.

the defendant here kept drugs and cash proceeds throughout the house and throughout the property, including in a safe found in the defendant's yard. *See id*. (noting that drugs were stored in unusual places at the defendants' home).

The testimony from the government's witnesses presented at trial and at sentencing also indicated that the drug storage and distribution at the defendant's home was more than a collateral or incidental use of the property. Melvin Bayless, a member of the 8th Judicial Task Force who took part in the March 7 search of the property, testified both at trial and at sentencing that when he interviewed the defendant after his arrest the defendant informed him that there was a suitcase buried on the premises containing marijuana, as well as a safe buried behind the residence, which only the defendant had access to, and which contained prescription pills as well as between $3,000 and $4,000 in cash. The defendant provided the names of several customers to Bayless and stated that he sometimes traded marijuana, motors, and other objects for pills with his customers. Bayless also testified about numerous full, half-full, and empty pill bottles scattered throughout the property.[11]

At trial, two of the informants who made the controlled purchases in this case also testified as to the nature and scope of the defendant's drug operation on his property. Jamie Hill testified that he had met the defendant five years prior to the start of this case and was introduced to him in order to purchase prescription narcotics. Hill testified that

---

[11] Similarly, Tony Clark, another member of the Task Force, testified about the surveillance equipment recovered during the execution of the search warrant, including several video cameras and a monitor.

he had been to the defendant's home more than twenty times in order to purchase narcotics. Hill also stated that one time he went to purchase drugs, the defendant went outside of his home to another place on the property to find prescription pills. Both Hill and Christine Nance, another informant, testified as to the number of people who were present at the house to purchase narcotics at any given time. In particular, Hill stated that on one occasion, the March 3, 2011 controlled purchase, there were so many people present that he and the defendant conducted the drug transaction in another bedroom than where they would typically do so. Nance stated that she knew of people going to the defendant's home and purchasing prescription pills. She testified that when she went to the defendant's home there were always other people there to purchase prescription pills, noting that people would often wait in line or that someone else would sell for the defendant.

As illustrated by the items recovered during the March 7, 2011 search of the property as well as the testimony of law enforcement officers who executed the search and those who purchased prescription pills from the defendant, the enhancement for maintaining a premises for drug storage and distribution is appropriate. The defendant was involved in substantial drug distribution and used his property in order to store prescription drugs and cash and keep them hidden from others. Accordingly, the defendant's objection is **OVERRULED**.

### III. Conclusion

For the reasons discussed herein, the defendant's objections to the PSR are **OVERRULED**. The enhancements pursuant to U.S.S.G. §§ 2D1.1(b)(1) and 2D1.1(b)(12) will be applied in this case, resulting in an offense level of 28, as set forth in the PSR.

IT IS SO ORDERED.

s/ Thomas A. Varlan<br>
CHIEF UNITED STATES DISTRICT JUDGE